```
1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF LOUISIANA
2                          SHREVEPORT DIVISION

3
   UNITED STATES OF AMERICA,     ) CRIMINAL ACTION NO. 5:18-mj-60
4                                ) MERGED INTO
                                 ) CRIMINAL ACTION NO. 5:18-cr-198
5                  Plaintiff,    )
                                 )
6             vs.                ) JUDGE FOOTE
                                 )
7  BLAKE LEE BISSELL,            )
                                 )
8                  Defendant.    ) MAGISTRATE JUDGE HORNSBY

9
              PRELIMINARY HEARING AND DETENTION HEARING
10
            Transcript of Digitally Recorded Proceedings
11
        before The Honorable Mark L. Hornsby, United States
12
      Magistrate Judge, Shreveport, Louisiana, commencing
13
      on July 10, 2018.
14
   Appearances of Counsel:
15
        For the Government:     BRIAN CHRISTOPHER FLANAGAN
16                              EARL M. CAMPBELL
                                U. S. Attorney's Office
17                              300 Fannin St., Ste. 3201
                                Shreveport, LA 71101-3068
18
        For the Defendant:     BETTY LEE MARAK, AFPD
19                              Federal Public Defender's Office
                                300 Fannin St., Ste. 2199
20                              Shreveport, LA 71101

21
        ************************************************
22

23                  Cathleen E. Marquardt, RMR, CRR
                    Federal Official Court Reporter
24                       Post Office Box 5056
                      Lafayette, Louisiana 70502
25                     Phone:  (337) 593-5223
```

1                           I N D E X

2                                                      PAGE

3    Witness for the Government:

4        THOMAS ANDERSON
             Direct by Mr. Flanagan                  4
5            Cross by Ms. Marak                     18

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Digitally Recorded Proceedings.)

 2               THE CSO:  All rise.

 3               THE COURT:  Thank you.  Be seated, please.

 4               The next matter is United States versus Blake Lee

 5     Bissell, 18-mj-60.  For the government is Mr. Flanagan and

 6     Mr. Campbell, and Ms. Marak is here with Mr. Bissell.

 7               We're here for a detention hearing and preliminary

 8     examination.  The Probation Offices have done their usual

 9     Pretrial Services review and report which has been provided to

10     counsel.  The Court will take that information into account.

11     It's not necessary to call witnesses simply to repeat what is in

12     the account.  The Court will take that into consideration on the

13     decision.

14               I note for the record that there is, under the Adam

15     Walsh Child Protection and Safety Act, there is a rebuttable

16     presumption in favor of detention in the matter.

17               Mr. Flanagan, are you ready to proceed?

18               MR. FLANAGAN:  Yes, Your Honor.

19               THE COURT:  And Ms. Marak, are you ready to proceed?

20               MS. MARAK:  We are, Your Honor.

21               THE COURT:  All right.  Mr. Flanagan, if you will call

22     your first witness, please.

23               MR. FLANAGAN:  Your Honor, the government calls Thomas

24     Anderson.

25               COURTROOM DEPUTY:  Do you solemnly swear that the
```

1   testimony you will give in this case will be the truth, the whole

2   truth, and nothing but the truth, so help you God?  If this is

3   your oath, please say "I do."

4              THE WITNESS:  I do.

5              THE COURT:  Have a seat, sir.

6                        THOMAS ANDERSON,

7   being first duly sworn or affirmed under oath, was questioned and

8   testified as follows:

9                        DIRECT EXAMINATION

10  BY MR. FLANAGAN:

11  Q.   Would you introduce yourself, please.

12  A.   My name is Thomas Anderson.

13  Q.   And how are you employed?

14  A.   I work as a special agent for the FBI.

15  Q.   And how long have you been so employed?

16  A.   One year.

17  Q.   What are some of your duties as an FBI agent?

18  A.   I investigate and enforce criminal law, federal criminal

19  law.

20  Q.   Are you familiar with the investigation of Mr. Blake

21  Bissell?

22  A.   I am.

23         THE COURT:  Mr. Flanagan, would you twist that mike so

24  it's right -- there you go.  Keep pushing, keep pushing.  There

25  you go.

1    Q.   (By Mr. Flanagan)  All right.  I just want to start with a

2    brief background.  Does the investigation involve a minor child?

3    A.   It does.

4    Q.   How old is the minor?

5    A.   The victim is 14.

6    Q.   And where did the minor live up until late June or early

7    July 2018?

8    A.   Wheeling, West Virginia.

9    Q.   Now how old is Mr. Bissell?

10   A.   27.

11   Q.   And where does he live?

12   A.   Haughton, Louisiana.

13   Q.   How did Mr. Bissell come into contact with the minor?

14   A.   On line, on the social media site known as YouNow.

15   Q.   Okay.  And what is YouNow?

16   A.   It's like a video blogging website where people can live

17   stream their daily activities.  They have followers who watch

18   them, comment on their pages, talk to each other.

19   Q.   So how exactly would he communicate with the minor?

20   A.   On YouNow.

21   Q.   Uh-huh.

22   A.   On Facebook messenger, on Snapchat.  The two, the victim and

23   Mr. Bissell shared an Instagram account and in physical letters.

24           THE COURT:  And what letters?

25           THE WITNESS:  Physical letters.

1          THE COURT:  Okay.  You said they shared a -- they

2     shared an app.  Did you say Instagram or Snapchat?

3          THE WITNESS:  An Instagram account.

4          THE COURT:  What does that mean, they shared it?

5          THE WITNESS:  That the account was a dual account for

6     both of them as a couple.

7          THE COURT:  All right.  Go ahead, Mr. Flanagan.  Sorry.

8     Q.  (By Mr. Flanagan)  Did Mr. Bissell ever travel to West

9     Virginia?

10    A.   Twice that I know of.

11    Q.   Okay.  Let's talk about the first time.  When was the first

12    time?

13    A.   In March 2018, Mr. Bissell traveled to Wheeling, West

14    Virginia, to give the victim a birthday present.

15    Q.   And how do you know that?

16    A.   Mr. Bissell told me.

17    Q.   And when you say he was giving her a birthday present, how

18    old was the minor?

19    A.   The minor was turning 14.

20    Q.   And did he know that the minor was turning 14?

21    A.   He did.

22    Q.   And how do you know that?

23    A.   I spoke with the mother of the victim, and the mother told

24    me that, when Mr. Bissell came to the house, she spoke with him

25    and advised him that her daughter was 14 years old and further

1   advised him to leave her daughter alone.

2   Q.   Let's talk about the second trip to West Virginia.   When was

3   that second trip?

4   A.   Mr. Bissell left Louisiana on June 30, 2018, sometime in the

5   morning of June 30th.

6   Q.   And what was the purpose of the second trip?

7   A.   To take the minor back down to Louisiana from her house in

8   Wheeling, West Virginia.

9   Q.   And how do you know that?

10   A.   That's what the minor told me and also from talking with

11   Mr. Bissell.

12   Q.   Okay.   So what happened during that second trip?

13   A.   Mr. Bissell arrived in Wheeling, West Virginia, around

14   midnight, July 1st, as captured on surveillance camera at the

15   victim's home.   He loaded bags in his pickup truck.   That license

16   plate was captured on the surveillance camera as well, and that

17   pickup truck with the minor and her possessions in it returned to

18   Haughton, Louisiana, around early morning of July 2nd.

19   Q.   Okay.   So he returned to Louisiana with the minor?

20   A.   Yes.

21   Q.   Did he use any kind of force on that second trip?

22   A.   Physical force?

23   Q.   Physical force.

24   A.   Not that I'm aware.

25   Q.   Did he have -- did he use a firearm?

```
1    A.   Not that I'm aware.

2    Q.   Are there any other victims that we know of?

3    A.   All the evidence that we recovered is still being gone

4    through.  It's in the preliminary stages, but in speaking with

5    the detective in Wheeling, West Virginia, he believes there is

6    another victim that they have had contact with.

7    Q.   Okay.  Back when they arrived in Louisiana, what time did

8    you say that was?

9    A.   Early morning of July 2nd, so a little after midnight.

10   Q.   And what did he do then?

11   A.   He introduced the victim to his roommate.

12   Q.   And did he introduce her in any particular way?

13   A.   As his girlfriend.

14   Q.   And what was the roommate's name?

15   A.   Tuesday Smith.

16            THE COURT:  Say that again.

17            THE WITNESS:  Tuesday, like the day of the week, Smith.

18            THE COURT:  Was the roommate any relation to

19   Mr. Bissell?

20            THE WITNESS:  No.  No, Your Honor.

21   Q.   (By Mr. Flanagan)  And how do you know that that's what he

22   did?

23   A.   Through speaking with the victim and through speaking with

24   Mrs. Smith.

25   Q.   Okay.  Did Mr. Bissell and the minor engage in any sexual
```

1   activity?

2   A.   Yes.

3   Q.   How do you know that?

4   A.   After we found the victim, we brought her to the Gingerbread

5   House which conducts child forensic interviews and had a child

6   psychologist speak with her about her experience.

7              And during that interview, the victim disclosed that

8   she'd had sex with Mr. Bissell multiple times in the trailer in

9   Haughton, Louisiana.

10  Q.   What type of sexual activity was it?

11  A.   Both oral and vaginal sex.

12  Q.   Is that something that the defendant could be charged with,

13  a criminal offense for?

14  A.   Yes.

15  Q.   How soon did the sexual activity begin in relation to

16  arriving back in Louisiana?

17  A.   Pretty immediate from what the victim stated.

18  Q.   Did Mr. Bissell provide any drugs or alcohol to the minor?

19  A.   Yes.

20  Q.   And what did he provide?

21  A.   When the minor was with Mr. Bissell, she was drinking

22  alcohol and smoking marijuana and taking Xanax.

23  Q.   And how do you know that?

24  A.   Through statements of the victim and through speaking with

25  the detective in Wheeling, West Virginia.

1      THE COURT:  Do you know if the young lady was -- had a

2   prescription for Xanax?

3      THE WITNESS:  I don't, Your Honor, but I -- what I've

4   been told by the detective in Wheeling was that, in the search

5   warrant return for Mr. Bissell's phone, he received messages from

6   Mr. Bissell to another individual attempting to procure Xanax for

7   the victim because she was experiencing anxiety.

8   Q.  (By Mr. Flanagan)  What did Mr. Bissell say to you, if

9   anything, regarding the whereabouts of the minor?

10  A.   Mr. Bissell told me that he did, in fact, drive up to West

11  Virginia from Louisiana, but that when he arrived at the victim's

12  house early the morning of July 1st, he loaded his car with her,

13  and immediately when they got on the road, the victim told him

14  she wanted to be dropped off at this park that he knew as the

15  Overlook.  He obliged.  Dropped her off.  Had not heard from her

16  since.

17      He also told me this park was sort of in the middle of

18  nowhere.  There were no cars around.  There was graffiti

19  everywhere.  That it was a rather unsavory place that he knew

20  that people would go to use drugs and participate in other kind

21  of illegal activity.

22  Q.  Okay.  And so based on what he told you at the time, that

23  the minor was up in West Virginia?

24  A.   Yes.

25  Q.  Did you search Mr. Bissell's residence?

1    A.    Yes.

2    Q.    And were any items recovered at the residence that belonged

3    to the minor?

4    A.    Yes.  Mr. Bissell gave us written consent to search through

5    the trailer, and in his room and room adjacent to his were a

6    number of bags belonging to the victim.  Three trash bags full of

7    clothing, two backpacks full of clothing and personal documents,

8    like, letters, school stuff; a laptop belonging to the victim,

9    and the victim's cell phone was located in a trash can right

10   outside the front door.

11          THE COURT:  How did you know it was the victim's cell

12   phone?

13          THE WITNESS:  Mr. Bissell told me it was the victim's

14   cell phone.  Mr. Bissell told me that all the things that were

15   located in the house were left in the trunk by the victim --

16   excuse me -- the bed of the truck by the victim when he dropped

17   her off at the Overlook.  So every time a new item was found,

18   Mr. Bissell said he forgot that that was also here, in his house.

19   Q.    (By Mr. Flanagan)  Okay.  Did anything that you recovered

20   suggest an intimate or sexual relationship between the minor and

21   Bissell?

22   A.    Yes.

23   Q.    And what were those items?

24   A.    One of the backpacks that the victim had, there were letters

25   between her and Mr. Bissell, letters she had written to

1   Mr. Bissell, and those letters, in particular, one was rules set

2   out from a subject she identified as "daddy," were rules and

3   punishments for the victim's behavior.  Some of those punishments

4   were sexual.

5   Q.   Okay.  And I want to look at those in just a second, but one

6   more question before I do that.

7        Did anything suggest that the minor in this case felt

8   either threatened or coerced?

9   A.   Yes.

10  Q.   And what was that?

11  A.   In one of the letters, the minor is expressing reservation

12  about leaving her house and coming down here.  I can't off the

13  top of my head -- wouldn't feel comfortable testifying exactly

14  what it said, but except to say she expressed reservation and was

15  in fact scared of Mr. Bissell.

16           MR. FLANAGAN:  Your Honor, may I approach the witness?

17           THE COURT:  Yes, sir.

18           Do you have a copy for Ms. Marak?

19           MR. FLANAGAN:  I gave her one, Your Honor.

20           MS. MARAK:  I'll get the whole stack?

21           MR. FLANAGAN:  Yes.

22           MS. MARAK:  Okay.

23           THE COURT:  Are you going to offer these under seal?

24           MR. FLANAGAN:  Yes, sir.

25           THE COURT:  Any objection, Ms. Marak?

1          MS. MARAK:  No objection.

2          THE COURT:  All right.  They are ordered admitted for

3    the purposes of this hearing only and they are also admitted

4    under seal.  I want to look at them in a little while.

5    Q.   Agent Anderson, I've handed you six pieces of paper.  Do you

6    recognize these documents?

7    A.   I do.

8    Q.   What are they?

9    A.   These are the documents I was just referring to that were

10   found in the possession of the minor victim in this case.

11   Q.   And they -- and those, I believe you said, were recovered in

12   Mr. Bissell's residence; is that right?

13   A.   Yes, sir.

14   Q.   And more specifically in his bedroom; is that right?

15   A.   Yes, sir.

16   Q.   Okay.  Looking at the first one which is marked Government's

17   Exhibit 1, what is this?

18   A.   This is a picture of the victim.

19   Q.   Does it fairly and accurately depict what the victim looks

20   like?

21   A.   Her hair is a darker color right now, but other than that,

22   same, same age.

23   Q.   Okay.  Looking at the next page that's been marked Exhibit

24   2, what is this?

25   A.   This is from what I would best describe as a diary belonging

1   to the victim where she is writing to her future child, and she

2   elaborates in this diary that she planned on having Mr. Bissell's

3   child, and she thought that documenting their courtship and just

4   the details of the relationship would be something the child

5   would want in the future.

6   Q.   Okay.  And how is the letter addressed on the top left?

7   A.   "Dear Little girl or Boy in my tummy soon."

8   Q.   Okay.  Did she sign her name at the bottom of that note?

9   A.   She signed it Mommy XXX, yes.

10  Q.   Okay.

11          THE COURT:  Let's don't use the name anymore.

12          THE WITNESS:  Sorry, Your Honor.

13  Q.   (By Mr. Flanagan)  Turn to the next page, Government's

14  Exhibit 3.  What is that?

15  A.   This is a set of rules that was recovered in the same

16  backpack that the victim was supposed to abide by.

17  Q.   And are Exhibits 4 and 5 also some of those rules?

18  A.   Yes.  One of those exhibits would be the punishments for

19  breaking the rules, Exhibit 5.

20  Q.   Okay.  Looking at Exhibit 5, what are the punishments that

21  are marked in yellow?

22  A.   "Must make shirtless vid of what turned you on or what you

23  want Daddy to do to you.  Must sit naked for the time set by

24  Daddy."

25  Q.   Do we have any indication that she followed -- that the

1    minor followed these rules?

2    A.   We do.

3    Q.   And what is that?

4    A.   Again, this is in the preliminary stage of the

5    investigation, so all the electronic evidence, search warrants

6    haven't been returned.  Everything hasn't been gone through, but

7    what we have right now is physical letters that document the

8    victim's reluctance to participate in some of these things, that

9    perhaps she had second thoughts about some of the punishments.

10   Q.   Okay.  And turning to the last one, Exhibit 6, what is that?

11   A.   This is a letter written by the victim where she expresses

12   some of those reservations.  Some of the rules that were put into

13   place were things like, don't talk negatively about yourself.

14   Q.   Okay.

15   A.   Some of them were, don't say I don't know, don't put the

16   phone on mute when we're talking.  And there was a document that

17   the victim had violated some of those rules.  In particular, she

18   hadn't kept the camera on when she was changing, and apparently

19   this started an argument.  And in this letter she's -- she says

20   that these punishments make her a bit scared of who she refers to

21   as Daddy.

22   Q.   Okay.  And could you read the first four lines on Exhibit 6?

23   A.   Yes.  (Reading:)  Daddy, yes, I want to live with you Daddy,

24   but I feel like something here is telling me, hey, stay a little

25   longer, and I just thought that -- that first my mom's stuff is

1    coming soon.

2    Q.   Okay.   Now, turning back to the minor, where was the minor

3    eventually found?

4    A.   At a motel in Arcadia, Louisiana.

5           THE COURT:   How did you know to look there?

6           THE WITNESS:   Well, Mr. Bissell -- the roommate came

7    home, Tuesday Smith, and Tuesday Smith had seen the minor, but at

8    this point Mr. Bissell had told me she was in Texas and she had

9    no cell phone to get in contact with.

10          So when she came home, she told us that the minor was

11   in fact there, and when Mr. Bissell was confronted with that

12   information, he told me he couldn't remember anything.   He

13   couldn't remember anything from June 30th to the present time,

14   that something was going on, but he did remember this motel in

15   Arcadia.

16          At almost simultaneously a phone call came to his phone

17   from an unmarked number in Arcadia, Louisiana, and when I picked

18   it up, it was a young girl on the other end who told me she

19   was -- confirmed she was the victim.

20   Q.   (By Mr. Flanagan)  And did you determine whose name that

21   motel or hotel room was booked under?

22   A.   Yes.

23   Q.   And whose name was that?

24   A.   Blake Bissell.

25   Q.   Was the minor given an STD test?

1   A.   Yes.   The minor was brought to the University Health

2   Hospital after she was recovered and underwent this forensic

3   interview and given a rape kit that includes tests that would

4   show if there were STDs present, if -- excuse me -- an HIV test,

5   but all that has not come back yet.

6   Q.   Okay.

7            MR. FLANAGAN:   Just a moment, Your Honor.

8   Q.   (By Mr. Flanagan)   One last question.   Were you able to

9   determine, the sexual intercourse, was it protected or

10  unprotected?

11  A.   It was unprotected, and I know that because the victim

12  during the forensic interview she underwent, told the child

13  psychologist that Mr. Bissell had told her he had a prostate

14  problem so he couldn't ejaculate and she couldn't get pregnant.

15           THE COURT:   You mentioned in answer to a prior

16  question, and I meant to follow up with you, and then I forgot,

17  that Mr. Bissell told you something about Texas?

18           THE WITNESS:   Yes, Your Honor.

19           THE COURT:   Tell me about that.

20           THE WITNESS:   Just in the course of speaking with

21  Mr. Bissell while we were trying to locate this girl, he -- we

22  were trying to corroborate his story that his other roommate

23  hadn't seen the girl there, even though all her belongings were

24  there, and she didn't have a cell phone, which was true, but the

25  idea that she was in Texas and we wouldn't see her was -- where I

1    got that idea from is Mr. Bissell said she was somewhere in Texas

2    and couldn't contact her.

3              THE COURT:  The roommate Ms. Smith said she had never

4    seen the victim at the mobile home?

5              THE WITNESS:  No, Your Honor.  Ms. Smith had seen the

6    victim there.

7              THE COURT:  Oh, okay.

8              THE WITNESS:  That's who he introduced the victim to

9    when he got home.

10             THE COURT:  Right.  Okay.  All right.

11             MR. FLANAGAN:  Your Honor, just to confirm, the

12   exhibits have all been admitted into evidence; is that correct?

13             THE COURT:  Under seal for purposes of this hearing.

14             MR. FLANAGAN:  Yes, sir.  Tender the witness.

15             THE COURT:  All right.

16                          CROSS-EXAMINATION

17   BY MS. MARAK:

18   Q.   Agent Anderson, my name is Betty Marak.  I represent

19   Mr. Bissell in today's proceedings.

20   A.   Good afternoon.

21   Q.   You indicated that Mr. Bissell and the minor met through a

22   social media platform?

23   A.   Yes, ma'am.

24   Q.   Has that social media platform been preserved?

25   A.   Not by me.  By Wheeling it has.

1   Q.   Okay.  And I want to talk about that.  How did Wheeling get

2   involved in this investigation?

3   A.   The victim in this case lives in Wheeling.

4   Q.   Right.

5   A.   And the mother of the victim filed a missing persons report

6   with the Wheeling Police Department --

7   Q.   Uh-huh.

8   A.   -- around noon on July 1st, that Sunday, around noon.

9   Q.   Okay.  So let's stop right there for just a moment.  So my

10  understanding is that Mr. Bissell left Shreveport or Haughton,

11  this area, on June 30th.  He traveled there, arrived around

12  midnight.  Would that be the midnight of the 30th leading into

13  the 1st or midnight of the 1st leading into the 2nd?

14  A.   30th leading into the 1st.

15  Q.   All right.  So that's when he arrives there?

16  A.   Yes.

17  Q.   Picks her up, and then her mother discovers she's missing at

18  noon that same day?

19  A.   Yes, ma'am.

20  Q.   Okay.  And the mother files a missing persons report?

21  A.   Yes, ma'am.

22  Q.   The mother knew that Mr. Bissell and the minor child had

23  contact with each other previously, correct?

24  A.   Yes, ma'am.

25  Q.   She was aware of this relationship as early as March?

1   A.   As far as I know, yes.

2   Q.   And that was when the visit happened?

3   A.   Yes.

4   Q.   And the birthday gift was delivered.

5   A.   Yes.

6   Q.   Do you know at what point the first contact ever was made

7   between Mr. Bissell and the minor?

8   A.   January 2018 is what Mr. Bissell told me.

9   Q.   Okay.  January 2018, and that was through this app with the

10  video blog?

11  A.   Yes, ma'am.

12  Q.   And I might not be describing it correctly, but that's my

13  understanding.

14  A.   Yes, ma'am.

15  Q.   So he's posting something, and she's following what he's

16  posting.

17  A.   Yes.

18  Q.   And prior to that, they didn't know each other that we're

19  aware of?

20  A.   Not that I'm aware of.

21  Q.   Are there text messages, you mentioned Snapchat, Instagram,

22  all of those things to indicate the progression, if you will, of

23  this relationship?

24  A.   Can you repeat that?

25  Q.   Right.  So they first make contact, as I understand it.  He

1    has a video blog and she becomes a follower, and one of them

2    reaches out to the other and they began communicating with each

3    other.

4    A.   Yes.

5    Q.   Right?  And they begin using social media platforms to

6    communicate?

7    A.   Yes.

8    Q.   Is that evidence preserved?  In other words, do we have text

9    messages or snapchats or instagrams, or those kinds of things

10   between the two parties?

11   A.   So how I know that right now is through talking with

12   Mr. Bissell, through talking with the victim, and through talking

13   with the victim's mother, through talking with the Wheeling

14   Police Department.  The Wheeling Police Department has some of

15   it, not just preserved, but has search warrant returns already.

16   So I don't have copies of that evidence in my possession if

17   that's what you are asking.

18   Q.   But you believe that it exists --

19   A.   Yes.

20   Q.   -- is what I'm saying.

21   A.   Yes, ma'am.

22   Q.   And the Wheeling Police Department is getting some of their

23   information -- this is a limited question.  They are getting some

24   of their information from her phone or from the social media

25   providers?

1    A.   The social media providers, as best I understand.

2    Q.   All right.  And did they begin only investigating this after

3    the missing persons report, or did they begin investigating this

4    sometime earlier after the March visit?

5    A.   I couldn't tell you.  I -- I wouldn't know exactly the

6    procedures of Wheeling or if that was even reported at first.

7    Q.   Okay.  You are saying what was reported, though; the visit,

8    the March visit?

9    A.   Yeah, I have no knowledge that that was reported.

10   Q.   All right.  You indicated that the mom had been interviewed

11   and she actually met Mr. Bissell in March?

12   A.   Yes.

13   Q.   And she said she had a conversation with him about the

14   victim's age, the minor's age?

15   A.   Yes.

16   Q.   You indicated that Mr. Bissell knew the minor's age.  Did he

17   know it before he went to Virginia that time or did he find out

18   from the mom?  Do you know?

19   A.   I don't know.

20   Q.   Okay.

21        THE COURT:  Where did you get the picture that is

22   Government's Exhibit 1?

23        THE WITNESS:  That was in the backpack belonging to the

24   victim.

25        THE COURT:  It was a paper copy?

1          THE WITNESS:  Yes.  Yes, sir.

2   Q.  (By Ms. Marak)  Did you show any of the paper copies to

3   Mr. Bissell prior to today?

4   A.  No, ma'am.

5   Q.  All right.  Let's talk about those for a minute and then

6   I'll get back to where I was.

7          THE COURT:  I'm sorry, Ms. Marak.

8          MS. MARAK:  That's all right, Judge.  I was going to

9   head there in a minute, so I'll go ahead while we're here.

10  Q.  (By Ms. Marak)  So the journal or the diary or the letter,

11  Exhibit 2 that you referred to which is the letter to the unborn,

12  unconceived child.

13  A.  Yes.

14  Q.  All right.  Do you know if Mr. Bissell has ever seen that

15  letter?

16  A.  I don't know.

17  Q.  All right.  And that was in her belongings, her things?

18  A.  Yes, ma'am.

19  Q.  And she is a 14-year-old girl writing these things, right?

20  A.  Yes.

21  Q.  Okay.  And they are in her backpack, her belongings?

22  A.  Yes.

23  Q.  And nothing -- now these are dated, correct?  One is dated

24  March the 16th of 20 -- of 2018, the one on the right, it looks

25  like?

1    A.    16th and 17th.

2    Q.    Through 16th, 17th, right, and that would be the first

3    trip, that would coincide with that trip?

4    A.    Yes, ma'am.

5    Q.    And then it looks like maybe there is a date on the left,

6    but I can't read it.  It's up in the left corner?

7    A.    Yes.  That's just a problem with the copy, but there's a

8    full date on all of them.

9    Q.    Okay.  What is the date on that one?

10   A.    I don't -- I don't have the original.

11   Q.    Oh, you don't know either.  Okay.

12         Then let's move to Government's Exhibit 5 which are the

13   punishments which go along with Exhibits 3 and 4 which are the

14   rules.  These were also found in her backpack?

15   A.    Yes, ma'am.

16   Q.    Is that right?

17   A.    Yes.

18   Q.    There are various colors on these.  Did she put those colors

19   on there or did someone else do that?

20   A.    I couldn't tell you.

21   Q.    Okay.  As part of the Gingerbread interview was she asked

22   about these documents?

23   A.    She was not.  They hadn't been discovered at that time.

24   Q.    Okay.  And Mr. Bissell has not been asked about these

25   documents?

1  A.   No, ma'am.

2  Q.   Okay.  And we really don't know, do we, that these documents

3  relate to Mr. Bissell?

4  A.   Well, I think there's some pretty compelling evidence that

5  was also located that would lead me to believe that "Daddy" is

6  Mr. Bissell.

7  Q.   But from what we have in these documents today, we don't

8  have that, right?

9  A.   From what we have in front of the Court, we don't have that.

10  Q.   These are in her handwriting?

11  A.   I couldn't tell you what her handwriting was like, ma'am.

12  Q.   Okay.  So we don't even know who wrote them.  We just know

13  they were in her backpack.

14  A.   Yes, ma'am.

15  Q.   Okay.  And she hasn't been asked about it, and he hasn't

16  been asked about it.

17  A.   No, ma'am.

18          THE COURT:  Do you know if Mr. Bissell used any

19  aliases?

20          THE WITNESS:  I'm familiar with him going by The Joker

21  or Mr. J.

22          THE COURT:  How are you familiar with that?

23          THE WITNESS:  He told me that when we talked.

24          THE COURT:  Because there's an item on Government's

25  Exhibit 3, line 6, that says "Always call me daddy, Daddy,

1    Puddin, Mr. J or Sir."

2              THE WITNESS:  Yes.  Similarly there's things in the

3    diary entries that refer to Daddy Blake, and in my possession I

4    have a calendar with Mr. Bissell's birthday that says "Daddy" on

5    it.  That was in the young girl's possessions.

6    Q.  (By Ms. Marak)  Okay.

7    A.   And there's a date in March, particularly, March 17th on

8    that calendar that says "Daddy" which is when Mr. Bissell drove

9    to Wheeling, West Virginia.

10   Q.   That's around the same time as the letter?

11   A.   Yeah, I just got those.

12   Q.   The card.

13   A.   They haven't been entered into evidence today.

14   Q.   All right.  So these things are in her backpack, right?

15   A.   Yes, in his room.

16   Q.   And you describe this diary or journal.  I'm picturing this

17   as maybe a notebook or something that's kind of bound together.

18   Are these things loose in there or are these part of what's in

19   that binding?

20   A.   Well, there are different things.  The diary entries

21   entitled "Dear Little girl or Boy in my tummy soon" --

22   Q.   Right.

23   A.   -- that's from a bound diary.

24   Q.   Okay.

25   A.   These other things entitled Rules and Punishments --

1    Q.   The color coded things?

2    A.   Yeah, exactly.

3    Q.   Right.

4    A.   Those were in a folder that was marked XXX Bissell.

5    Q.   Okay.

6    A.   Which -- I'm sorry, Your Honor -- it was marked with the

7    victim's name and the defendant's last name.  So they were in

8    separate places in the backpack.

9    Q.   Same backpack, but they are not all one combined, bound

10   volume?

11   A.   No, ma'am.

12   Q.   All right.  Then we have the final thing is Government's

13   Exhibit 6, which I would describe as a letter, perhaps?

14   A.   Yes, ma'am.

15   Q.   That does not have a date on my copy.  Does it have a date?

16   A.   No.  This is an accurate representation.  Nothing is missing

17   from the corners of this one.

18   Q.   Okay.  And do we know if this was written in West Virginia

19   or if this was written in Haughton?

20   A.   The victim hasn't been asked about this yet, so I couldn't

21   tell you.  I don't know.

22   Q.   Okay.  And the lines you read which are basically is that

23   she wants to live with him or with the person she identifies as

24   "Daddy," whether it's him or someone else.

25   A.   The lines I've read indicate that, yes.

1   Q.   Okay.  And do you know what the next -- the final line that

2   you read, or maybe you didn't read it.  The line that's marked in

3   yellow, "my mom's stuff is coming soon," do you have any

4   indication what that's about?

5   A.   No.  Be hard for me to -- yeah, I don't know what that's

6   about.

7   Q.   And you haven't asked her about this either?

8   A.   No.

9   Q.   Okay.

10  A.   Then the next line says, "your bank something, theory."

11             THE COURT:  Your bank thing happened.

12             THE WITNESS:  Your bank thing -- thingy.

13             THE COURT:  Do you know what that means?

14             THE WITNESS:  No.  I think the more pertinent parts of

15  this letter are at the bottom.

16             THE COURT:  Well, the pertinent part right now is the

17  part I'm asking you about.

18             THE WITNESS:  Yes, Your Honor.  I don't know what that

19  stuff means at the top.  I'm sorry.

20             THE COURT:  All right.

21  Q.   (By Ms. Marak)  You also testified earlier that you've -- in

22  your conversations with the detective in West Virginia, that he

23  thinks there is another victim.

24  A.   Yes.

25             THE COURT:  In West Virginia?

1          THE WITNESS:  Yes, Your Honor.

2     Q.   (By Ms. Marak)  Do you have any indication that Mr. Bissell

3     ever had contact with any other minor in West Virginia?

4     A.   Again, I'm not trying to be disrespectful, but this is in

5     such an early stage of the investigation, that I'm going solely

6     off the word of this detective up there.  So I don't personally

7     have any knowledge of Mr. Bissell having any contact with anyone

8     else.

9     Q.   And that is my point is that we know that he made two trips,

10    and in both of those trips he visited with this individual and

11    was not gone for very long either time, correct?

12    A.   Yes.  All their contact, though, a majority of their contact

13    was over video services on line which wouldn't prohibit him

14    geographically from contacting anyone.

15    Q.   Certainly.

16    A.   But that's all I can tell you.

17    Q.   But the fact that he's contacted someone doesn't make that

18    person a victim, does it?

19    A.   Again, all I can tell you is the way that Wheeling, the

20    Wheeling detective described to me was he believes they have

21    another victim that was being groomed.

22    Q.   And that's the word that was used, groomed?

23    A.   He used the word "groomed," yeah.

24    Q.   And as I appreciate your testimony, this minor's phone was

25    found here, and you have also seized Mr. Bissell's phone; is that

1    correct?

2    A.    Yes, ma'am.

3    Q.    And both of those are going to be, if not already in the

4    process, forensically examined?

5    A.    Yes, ma'am.

6    Q.    But we don't know the results of that today.

7    A.    No, ma'am, we don't.

8    Q.    Let's talk about, Mr. Bissell was arrested actually in

9    Haughton, right?

10   A.    Yes, ma'am.

11   Q.    Were you present --

12   A.    I was.

13   Q.    -- at his arrest?  How many agents were there at his arrest?

14   A.    I can give you an estimate.

15   Q.    That's fine.

16   A.    I think there were at the time of his arrest three, four.

17   Q.    Okay.  And was Tuesday Smith home when you guys arrived?

18   A.    No, ma'am.

19   Q.    Was Mr. Bissell there when you arrived?

20   A.    Yes.

21   Q.    And he was immediately arrested?

22   A.    No, ma'am.

23   Q.    Okay.  Tell me about that.  What happened?

24   A.    Well, at first we knocked on the door and spoke with

25   Mr. Bissell and asked him if he knew this girl.  He --

```
1    Q.    Did you have a photo at that point?

2    A.    Yeah.

3    Q.    Or did you just give a name or --

4    A.    No, we had a photo and a name, and he was shown that name,

5    and he told us he knew her, and he gave consent to look for her

6    in the home.

7    Q.    In the home, right.

8    A.    And that's when all this started.  That's when some of the

9    things I talked about earlier when he indicated that he had been

10   up to West Virginia, but he dropped her off at this park.  That's

11   when all that happened.

12   Q.    That statement.

13   A.    Yes, at that time he was just -- he was not under arrest.

14   Q.    You were just making an inquiry?

15   A.    Yes, ma'am.

16   Q.    Is the photo that he was shown the photo we have in evidence

17   or a different photo?

18   A.    It was a different photo.  It was on like a missing persons

19   poster --

20   Q.    Okay.

21   A.    -- from Wheeling.

22   Q.    All right.  And how did you get word that she might be in

23   the Haughton or Shreveport area?

24   A.    I was contacted by an FBI agent in Wheeling, West Virginia,

25   who was contacted by the Wheeling Police Department who had been
```

1    in contact with Mr. Bissell, and Mr. Bissell said he was down

2    here, and told them, yes, I've been up to West Virginia, but I

3    dropped her off.  I'm back home now.

4    Q.   And they were able to locate him or have him as a person of

5    interest because of the truck and a license plate number, is

6    that --

7    A.   Yes.  And his phone, too.  They were tracking his phone.

8    They also have records of that.

9    Q.   Who was tracking his phone?

10   A.   Wheeling --

11   Q.   Wheeling?

12   A.   -- Police Department.

13   Q.   Wheeling Police Department?  And so that tracking would have

14   happened sometime between the 1st and about the 5th?

15   A.   They took the report at noon.

16   Q.   Uh-huh.

17   A.   I suppose whenever they got the paperwork in, the

18   appropriate legal paperwork, they started at.

19   Q.   So you don't know exactly when the tracking started.  It was

20   pretty early on?

21   A.   Yes.

22   Q.   So when does the roommate give consent?

23        So you have the first search.  Let's get back to that.

24   And you were just searching for the girl; is that right?

25   A.   Yes.

33

1    Q.    And you don't find her --

2    A.    No.

3    Q.    -- at the mobile home?

4    A.    No.

5    Q.    Do you leave and then come back?

6    A.    No.

7    Q.    All right.  What happens next?

8    A.    When one of the other agents was in the bedroom, in plain

9    view on the bed was this backpack with the victim's Social

10   Security card laying on the bed next to it.  So once that was

11   found, Mr. Bissell was detained.

12   Q.    Okay.  And then?

13   A.    Well, then I spoke with Mr. Bissell some more about what had

14   transpired between him and the girl, and that's again back to the

15   West Virginia, when he went up there.

16   Q.    Right.

17   A.    And he signed a consent form to search the rest of his

18   areas.

19   Q.    Uh-huh.

20   A.    And his phone and the -- the sheds outside behind the

21   trailer.

22   Q.    So he consents to that search?

23   A.    Yes.

24   Q.    All right.  And so you -- the four of you, or however many

25   agents are there, begin to search those areas?

34

1   A.   Yes.

2   Q.   And so then does the roommate come home during this search?

3   A.   Yeah.

4   Q.   All right.  And you said she gave consent to search?

5   A.   I'm not sure I said that.

6   Q.   Okay.  Did she ever give consent to search, the roommate?

7   A.   Not to me and not to my knowledge.  I don't know, though.

8   Q.   All right.  So you would have been operating under his

9   consent to search.

10  A.   Yes.

11            THE COURT:  Is Tuesday Smith a male or a female?

12            THE WITNESS:  It's a female.

13            THE COURT:  Let me see counsel over here.

14               (Bench conference off the record.)

15  Q.  (By Ms. Marak)  Agent Anderson, how quickly was the victim

16  located after the search of the mobile home?

17  A.   I would have to estimate.  I'd say about three hours.

18  Q.   Okay.  So it was the same day?

19  A.   Same day, yeah.

20  Q.   All right.  And she was immediately taken to University

21  Health or to the Gingerbread House?

22  A.   She was taken to the Gingerbread House first.

23  Q.   All right.  And those are recorded interviews to the best of

24  my knowledge, so that will be available?

25  A.   Yes, ma'am.

1    Q.    And from there she was then taken to the University Health?

2    A.    Yes, ma'am.

3    Q.    And you said all of that stuff has been submitted and we

4    don't have those results.

5    A.    No, we don't.

6          THE COURT:  Do you have possession of Mr. Bissell's

7    phone?

8          THE WITNESS:  We do, Your Honor.

9          THE COURT:  Have you taken any steps yet to do a

10   forensic on it?

11         THE WITNESS:  Yes, sir.  Mr. Bissell on scene consented

12   to a forensic imaging of his phone, and a law enforcement officer

13   conducted that on scene, but I don't have those results yet.

14         THE COURT:  Okay.

15         THE WITNESS:  I frankly don't know if they were even

16   viable, given the nature of his phone.

17         THE COURT:  What does that mean?

18         THE WITNESS:  Like if he -- if his phone was password

19   protected or an image would be -- some phones just don't do them

20   anymore, so I don't know if the results of that were even

21   anything.

22         THE COURT:  Okay.

23   Q.  (By Ms. Marak)  You also said that her phone was found in the

24   trash can --

25   A.    Yes, ma'am.

1  Q.   -- right?  And you have that as well?

2  A.   Yes, ma'am.

3  Q.   And there's going to be a forensic exam of that phone?

4  A.   Yes, ma'am.

5  Q.   And has she consented to that?

6  A.   The mother of the victim consented to that.

7  Q.   All right.  When she was located in the hotel in Arcadia,

8  was she by herself or was there someone else with her?

9  A.   She was by herself.

10          MS. MARAK:  That's all the questions I have, Your

11  Honor.

12          THE COURT:  All right.  The government's motion to

13  detain Mr. Bissell is granted.  There is strong evidence that

14  Mr. Bissell transported a minor from West Virginia to Shreveport

15  for the purpose of performing criminal sexual acts upon her.  The

16  evidence is very strong even though it's preliminary at this

17  point.

18          I recognize the mental health issues that I'm not going

19  to say into the record.  Everyone in here knows it, but there are

20  absolutely no conditions that I could impose that would

21  reasonably assure the safety of other young members of our area

22  if Mr. Bissell is released from prison.

23          We're going to set -- I also find there's probable

24  cause to support the allegations that are in the criminal

25  complaint.

1          We're going to set further proceedings or arraignment

2    on August the 13th at 2:00, August the 13th at 2:00.  Mr. Bissell

3    is remanded to the custody of the marshal pending those further

4    proceedings.  Thank you all.

5          MR. FLANAGAN:  Your Honor.

6          THE COURT:  Just one moment.

7          MR. FLANAGAN:  Your Honor, we would just ask that any

8    reference, inadvertent or otherwise, to the minor's name be

9    stricken from the record.

10         THE COURT:  The Court is going to order that that be

11   done, and any transcript that is prepared of this must be

12   redacted to remove the references to the victim.

13         THE CSO:  All rise.

14              (Hearing concluded.)

15              *  *  *  *  *  *

16              **REDACTION CERTIFICATION**

17         I, Cathleen E. Marquardt, RMR, CRR, Federal Official

18   Court Reporter, do hereby certify this 17th day of August, 2018,

19   that the foregoing pages 1-37 constitute a true redacted

20   transcript, as ordered by The Court, of the digitally recorded

21   proceedings had in the above-entitled matter.

22                   */s/ Cathleen E. Marquardt*
                    Federal Official Court Reporter

23

24

25